The People of the State of Illinois by the Attorney General of State of Illinois, Appellee, v. John Barbuas et al., on appeal of William Craick et al., Appellants.

## Gen. No. 28,678.

CONSTITUTIONAL LAW—*"commerce clause" of federal constitution not violated by Public Utilities Act.* The provisions of the Public Utilities Act, sec. 55a, Cahill's Ill. St. ch. 111a, ¶ 72, requiring a certificate of public convenience and necessity as a condition precedent to the right to operate motor vehicles carrying passengers for hire over the streets and highways of the State, and of section 90, Cahill's Ill. St. ch. 111a, ¶ 109, making the act inapplicable to interstate commerce, except in so far as the same may be permissible under the federal constitution, Acts of Congress and decisions of United States Supreme Court, are a proper exercise of the State's police power to regulate the use of its streets and highways as a matter of local concern, and are applicable to motor vehicles engaged in interstate carriage of passengers for hire, operating between points in the City of Chicago and the State of Indiana, especially where it is admitted that the condition of the highways and traffic thereon make regulation necessary.

Interlocutory appeal by defendants from the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding. Heard in the second division of this court for the first district. Affirmed. Opinion filed October 2, 1923. Rehearing denied October 15, 1923.

WINSTON, STRAWN & SHAW, for appellants; JOHN C. SLADE and JOHN C. MANN, of counsel.

EDWARD J. BRUNDAGE and ROBERT N. HOLT, for appellee; ROBERT N. HOLT, of counsel.

MR. JUSTICE FITCH delivered the opinion of the court.

The Attorney General, in the name and on behalf of the People, filed a bill in equity in the Superior court praying that the defendants (appellants) be enjoined from operating any motor vehicle or motor bus for the transportation of passengers for hire on the public highways of Illinois, until they shall have obtained from the Illinois Commerce Commission a certificate of necessity and convenience under the provisions of the Public Utilities Act of this State. The bill was verified and fifteen of the defendants filed sworn answers. In their answers the defendants admit that they are operating motor vehicles and motor busses for the transportation of passengers for hire over certain of the streets and highways of Chicago without having obtained such a certificate, but they allege that all their passengers are so transported "in the course and as a part of a through transportation" along a route beginning at a privately owned station near the corner of South Park avenue and 63rd street, Chicago, running thence southerly and southeasterly along certain named public streets of Chicago and across the State line at Indianapolis avenue and 106th street, and thence over certain streets in Indiana to the cities of Hammond, Indiana, and Gary, Indiana, or beginning at one or the other of said cities and proceeding along the same route to the station at 63rd street and South Park avenue, Chicago. The answers assert that such transportation of passengers is interstate commerce, and deny that defendants are public utilities within the meaning of the Public Utilities Act, and, in effect, claim that the defendants are not subject to the requirements of that act. Upon the filing of such an-

swers the complainant asked for and obtained a preliminary injunction restraining the operation of defendants' motor vehicles upon any of the public streets or highways of Illinois until the further order of the court. This appeal followed.

The sole question presented and argued in this court is whether the defendants may use the public highways of this State in the manner stated by them in their answers, without conforming to the requirements of the Public Utilities Act of 1921. Section 10 of that Act [Cahill's Ill. St. ch. 111a, ¶ 25] defines the term "public utility," as used in the Act, to mean and include every corporation, association, partnership or individual—with certain exceptions not here involved—that owns, controls, or operates for public use any property used for or in connection with the transportation of persons or property between points in this State. Section 55 [Cahill's Ill. St. ch. 111a, ¶ 71] provides that no public utility—with certain exceptions not here involved—shall transact any business in this State until it shall have obtained a certificate from the Commission that public convenience and necessity require the transaction of such business. Section 55a [Cahill's Ill. St. ch. 111a, ¶ 72] provides that no person shall operate any motor vehicle upon any public street or highway in this State for the carriage of passengers for hire unless he shall file with the Commission sworn proof of his ability to pay all damages which may result from accidents due to negligence in the operation of his motor vehicle, or file an indemnity bond, or procure insurance, covering the same. Section 90 [Cahill's Ill. St. ch. 111a, ¶ 109] provides that the act shall not be construed to apply to interstate commerce "except when specifically so stated, and in so far as the same may be permitted under the provisions of the Constitution of the United States and Acts of Congress, and the decisions of the Supreme Court of the United States."

If the defendants' own statements contained in their sworn answers as to the nature and character of the business conducted by them be accepted as true, we think it is clear that the defendants in the prosecution of their business are public utilities within the meaning of that term as defined in section 10. As we understand the arguments, this conclusion is not seriously controverted. On the other hand, the Attorney General does not here dispute defendants' claim that their business is interstate commerce by reason of the fact that they carry passengers for hire across the State line, but he insists that in the absence of any affirmative action by Congress on the subject, the State, in the exercise of its police power, may lawfully require those engaged in such business to conform to the regulations prescribed by the Utilities Act. It is conceded that there is no act of Congress regulating the business of carrying passengers for hire in motor vehicles from one State to another. Hence it follows that whether the Utilities Act applies to the operation of defendants' motor vehicles in the manner stated depends upon the question whether the requirements of section 55 of that Act are (to use the language of section 90) "permitted under the provisions of the Constitution of the United States and the decisions of the Supreme Court of the United States."

The extent to which the commerce clause of the federal constitution permits local regulations to be made concerning persons and corporations engaged in interstate commerce has been the subject of many decisions of the United States Supreme Court. Counsel on both sides cite and rely upon the decisions of that court in the consolidated *Minnesota Rate Cases,* 230 U. S. 352. In deciding those cases, the court reviews at some length its former decisions upon this subject, and states the controlling principle (p. 399) to be that with respect to matters of interstate com-

merce which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed "by a single authority," then the commerce clause of the constitution, of its own force and without any action by Congress, exempts such interstate commercial intercourse from the direct control of the States; but that "in other matters, admitting of diversity of treatment according to the special requirements of local conditions, the States may act within their respective jurisdictions until Congress sees fit to act." The court cites, as falling within the first class thus mentioned, a number of cases in which the court had held State legislation void which sought to tax interstate commerce, either by levying the tax upon the business which constitutes such commerce, or the privilege of engaging in it, or the receipts, as such, derived from it, or to exclude from the limits of the State persons and corporations engaged in interstate commerce, or "to fetter by conditions their right to carry it on (*Crutcher v. Kentucky,* 141 U. S. 47)," or to prohibit interstate trade in legitimate articles of commerce, or to subject the operations of interstate carriers to requirements that are unreasonable, or unnecessary for local protection. The court then further defines the second class above mentioned in the following language (p. 402): "But within these limitations there necessarily remains to the States, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending federal intervention. * * * It is competent for a State to govern its internal commerce, to provide local improvements, *to create and regulate local facilities, to adopt protective measures of a reasonable character in the in-*

*terest of the health, safety, morals and welfare of its people, although interstate commerce may incidentally or indirectly be involved.* Our system of government is a practical adjustment by which the national authority as conferred by the constitution is maintained in its full scope without unnecessary loss of local efficiency. *Where the subject is peculiarly one of local concern, and from its nature belongs to the class with which the State appropriately deals in making reasonable provision for local needs, it cannot be regarded as left to the unrestrained will of individuals because Congress has not acted, although it may have such a relation to interstate commerce as to be within the reach of the federal power."*

The opinion of the court then notes the leading illustrations of cases falling within the second class, mentioning, with others, the power of the States to provide for the construction of dams and bridges across navigable rivers, although interference with navigation may result therefrom; to regulate the opening and closing of such bridges, as in the case of *Escanaba & L. M. Transp. Co. v. Chicago,* 107 U. S. 678; to regulate wharfage charges and exact tolls "although the payment is required of those engaged in interstate or foreign commerce"; to make quarantine regulations and to pass reasonable inspection laws "designed to safeguard inhabitants of the State from fraud and imposition, * * * although they may affect interstate commerce" in some respects; to pass laws for the protection of game and the preservation of a valuable food supply; to hold interstate carriers answerable, according to the law of the State, for nonfeasance or misfeasance within its limits; to require engineers employed by interstate carriers to have a license (*Smith v. Alabama,* 124 U. S. 465); to require interstate carriers to observe Sunday laws (*Hennington v. Georgia,* 163 U. S. 299); and to forbid the consolidation of State railroad corporations

with competing lines "although both may be interstate carriers and the prohibition may have a far-reaching effect upon interstate commerce." The opinion finally quotes the words of Chief Justice Marshall in *Gibbons v. Ogden,* 9 Wheat. (U. S.) 1, 203, holding that within the State power is included: "that immense mass of legislation, which embraces everything within the territory of a State, not surrendered to the general government; all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, *and those which respect turnpike roads, ferries, etc.,* are component parts of this mass. No direct general power over these objects is granted to Congress; and, consequently, they remain subject to State legislation. If the legislative power of the Union can reach them, it must be for national purposes; it must be where the power is expressly given for a special purpose, or is clearly incidental to some power which is expressly given."

In a later case (*Port Richmond & Bergen Point Ferry Co. v. Hudson County,* 234 U. S. 317), the same court had under consideration the right of the State of New York to prescribe rates for the use of a ferry across the Kill von Kull from Port Richmond, Staten Island, New York, to Bergen Point, Hudson County, New Jersey. The court upheld the power of the State to prescribe such rates, saying that in determining that question regard must be had to the basic principle involved, which is stated as follows: "That principle is, as repeatedly declared, that as to those subjects which require a general system or uniformity of regulation, the power of Congress is exclusive; that, in other matters, admitting of diversity of treatment, according to the special requirements of local conditions, the States may act within their respective jurisdictions until Congress sees fit to act." At page

331 of the opinion in that case, the court says: "Ferries, such as are involved in the present case, are simply means of transit from shore to shore. These have always been regarded as instruments of local convenience, which, for the proper protection of the public, are subject to local regulations; and where the ferry is conducted over a boundary stream, each jurisdiction with respect to the ferriage from its shore has exercised this protective power."

In *Wiggins Ferry Co. v. City of East St. Louis*, 107 U. S. 365, the City of East St. Louis, pursuant to a statute authorizing cities "to license, tax and regulate ferries," passed an ordinance forbidding any person or corporation from operating a ferry within that city without paying an annual license fee for each boat plying between East St. Louis and the opposite bank of the Mississippi river. The Wiggins Ferry Company had operated such a ferry for many years prior to the passage of such ordinance, having one landing in East St. Louis, Illinois, and the other in St. Louis, Missouri, and, upon its refusal to pay the license fee required to be paid by the ordinance, was sued by the city in an action of debt. The trial court gave judgment for $1,600, which was affirmed, first by the Appellate Court for the Fourth District, and next by the Supreme Court of this State (102 Ill. 560). The ferry company then sued out a writ of error in the Supreme Court of the United States, where it contended that the exaction of a license fee or tax upon boats used in ferrying passengers and goods across a navigable river from one State to another was an attempt by the State to regulate interstate commerce and therefore repugnant to the commerce clause of the Constitution of the United States. The Supreme Court held against this contention, saying: "The exaction of a license fee is an ordinary exercise of the police power," and that under such power the State, or a city to whom such power is delegated, may impose a license tax upon keepers of ferries,

"although their boats ply between landings lying in two different States," and that such a license fee or tax is not such a regulation of interstate commerce as is prohibited by the commerce clause of the federal constitution.

In *Hendrick v. Maryland*, 235 U. S. 610, Hendrick, a citizen and resident of the District of Columbia, left his office in Washington in his own automobile and drove it into Prince George's county, Maryland, and while temporarily there was arrested on the charge of operating his automobile upon the highway without having procured the certificate of registration required by the Motor Vehicle Act of the State of Maryland. The Maryland statute provided that before any motor vehicle is operated upon the highways of that State the owner shall make a statement to the commissioner of motor vehicles and procure from him a certificate of registration and a number plate, and pay a designated registration fee. Hendrick had not procured such a certificate, and was therefore found guilty and fined. He appealed and the case eventually reached the Supreme Court of the United States on an agreed state of facts. Hendrick maintained that the Maryland act was void because it attempted to regulate interstate commerce. The Supreme Court held the contrary and sustained the validity of the Maryland statute. In the course of its opinion the court said (p. 622): "The movement of motor vehicles over the highways is attended by constant and serious dangers to the public, and is also abnormally destructive to the ways themselves. Their success depends on good roads, the construction and maintenance of which are exceedingly expensive; and in recent years insistent demands have been made upon the States for better facilities, especially by the ever-increasing number of those who own such vehicles. As is well known, in order to meet this demand and accommodate the growing traffic the State of Maryland

has built and is maintaining a system of improved roadways. Primarily for the enforcement of good order and the protection of those within its own juris-diction the State put into effect the above-described general regulations, including requirements for regis-tration and licenses. * * * *In the absence of na-tional legislation covering the subject, a State ,may rightfully prescribe uniform regulations necessary for public safety and order in respect to the operation upon its highways of all motor vehicles—those mov-ing in interstate commerce as well as others. And to this end it may require the registration of such ve-hicles and the licensing of their drivers, charging therefor reasonable fees graduated according to the horse-power of the engines—a practical measure of size, speed and difficulty of control. This is but an exercise of the police power uniformly recognized as belonging to the States and essential to the preserva-tion of the health, safety and comfort of their citizens; and it does not constitute a direct and material bur-den on interstate commerce.*"

This case was followed in the case of *Kane v. New Jersey,* 242 U. S. 160, where a similar law of New Jersey was involved. Kane, a resident of New York, was arrested while driving his automobile on the pub-lic highways of New Jersey. It was stipulated that he had been duly licensed as a driver under the laws of both New York and Jersey; that he had registered his car in New York, but not in New Jersey; that he had not filed with the Secretary of State of New Jersey an instrument appointing that official his at-torney on whom process might be served, as required by the New Jersey law, and that when arrested he was on his way from New York to Pennsylvania. Kane contended that the New Jersey statute was in-valid as to him, a nonresident, because it violated the constitution and laws of the United States regulating interstate commerce. These contentions were over-

ruled in the trial court and he was fined. The conviction was reviewed and sustained both in the Supreme Court and the Court of Errors and Appeals of New Jersey, and was again affirmed in the United States Supreme Court, upon the authority of *Hendrick v. Maryland, supra.*

From these decisions of the United States Supreme Court, we think it is clear that regulations of the character involved in this case are not only "permitted" by the decisions of that court with respect to the relative rights and powers of the States and of the federal government under the commerce clause of the federal constitution, but that regulations of a similar character with reference to the use of State highways and boundary ferries have been expressly approved by that court as a proper exercise of the State's police power in such cases.

The power to control public streets and to provide for the proper adjustment of conflicting rights and interests therein is a police power. (13 R. C. L. 144; *Christy v. Elliott,* 216 Ill. 31.) The right to use the public streets for the purposes of travel is not an absolute, unqualified right, as claimed by appellants. It is subject to be limited and controlled by the State whenever necessary to provide for and promote the safety, peace, health, morals and general welfare of the people. (*State v. Mayo,* 106 Me. 62.) In cases where the use by motor vehicles of narrow streets, or highways that have sharp curves and steep grades, is attended with danger to the public, it has been held a proper exercise of the State's police power to absolutely prohibit their use upon such highways. (*State v. Mayo, supra; Commonwealth v. Kingsbury,* 199 Mass. 542.)

It is alleged in the bill, and not specifically denied by the answers, that the streets and highways upon which the defendants are operating their motor vehicles are "densely traveled," and it is a matter of common knowledge that the use of such vehicles under

such circumstances is attended with much inconven-
ience and some danger to the rest of the traveling
public who use such highways, and causes excessive
wear and even destruction of the pavements of such
streets and highways. It is also a matter of common
knowledge that most of the recently constructed con-
crete pavements upon the highways of this State are
of the width of eighteen feet or less, and sometimes
flanked on both side by ditches for drainage. It is
apparent from the language of sections 55 and 55a of
the Public Utilities Act that one purpose, at least,
in requiring a certificate of necessity and convenience
to be obtained by public utilities who operate motor
busses upon the public highways of the State for the
transportation of passengers for hire is to protect
and safeguard the interests of the traveling public
in the use of such highways, by ascertaining in ad-
vance whether the proposed use of the highways by
such utilities is likely to be fraught with danger or
serious inconvenience to the public and whether the
operators thereof are in a position to respond in dam-
ages for injuries resulting from their negligent or
wrongful use of the highways proposed to be used.

Appellants' counsel place much reliance upon the
cases of *Crutcher v. Kentucky,* 141 U. S. 47; and
*Dahnke-Walker Milling Co. v. Bondurant,* 257 U. S.
282. In the first of these cases an act of the legis-
lature of Kentucky providing that the agent of an
express company not incorporated by the laws of that
State shall not carry on business there without first
obtaining a license from the State, after satisfying
the auditor that his company has a capital of at least
$150,000, was held to be a regulation of interstate
commerce so far as the act purported to apply to a
corporation of another State engaged in that busi-
ness, and was therefore void as repugnant to the com-
merce clause of the United States Constitution. The
decision is based upon the conclusion of the court that

the Kentucky statutes required a foreign corporation to take out a license *for the mere privilege of carrying on interstate commerce.* In the latter of such cases, it was held that the mere fact that a Tennessee corporation has no license to do business in Kentucky, as required by the laws of the latter State, does not prevent such corporation from recovering on a contract made in Kentucky, and to be performed in Kentucky by delivering to a common carrier the goods contracted to be sold. . The court held that such a transaction is interstate commerce, and that the principle involved was the same as in the *Crutcher* case. The same principle was applied in *International Text-Book Co. v. Pigg,* 217 U. S. 91, and in *Buck Stove & Range Co. v. Vickers,* 226 U. S. 205. All of these cases are wholly different in character from the present case, in that in each of such cases the interstate commerce, which was thus attempted to be "fettered by conditions" was not in any sense a subject of "peculiarly local concern," did not involve the use of local facilities, such as highways, and was not affected by any consideration of local public welfare or safety. Evidently the Supreme Court did not regard the principle announced in the *Crutcher* case as determinative of the question involved in the later cases of *Hendrick v. Maryland, supra,* and *Kane v. New Jersey, supra;* for in both of those cases the same court held that in the absence of any action by Congress a State may, in the exercise of its police power, forbid the use of its highways to the owner of a motor vehicle who has not obtained its license to use the same, that is, who has not obtained a certificate of registration and license plate, even though such motor vehicle only uses such highways for the purpose of interstate travel in going from one State into or through another State. The analogy between such a certificate and the certificate required by the Utilities Act seems to us to be obvious and complete.

For the reasons stated the interlocutory injunction order of the superior court is affirmed.

*Affirmed.*

GRIDLEY, P. J., and BARNES, J., concur.